1

2

3

4

5

6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

7

8

TIFFANY KNICKERBOCKER, a
single person; DARCY BODY, a
single person,

9

                              Plaintiffs,

        v.

10

11

CITY OF COLVILLE, a municipal
sub-division of the State of
Washington, and REX NEWPORT,

12

                              Defendants.

13

NO:  2:15-CV-19-RMP

ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

14

15

16

17

18

        BEFORE THE COURT is Defendant City of Colville's Motion for Summary
Judgment of Defendant City of Colville and Defendant Rex Newport in his Official
Capacity, **ECF No. 39**.  The Court has reviewed the motion, the response
memorandum (ECF No. 54), and the reply memorandum (ECF No. 62), has heard
argument from counsel, and is fully informed.

19

**BACKGROUND**

20

21

        Defendant Rex Newport is a former patrol officer with the City of Colville
Police Department ("Colville").  ECF No. 40 at 1.  Newport admits that he had

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 1

multiple sexual encounters with Plaintiffs Darcy Body and Tiffany Knickerbocker while on duty working the graveyard shift. *Id.* at 2.

**A. Incidents Involving Plaintiff Body**

Prior to March 2013, Body knew of Newport but did not socialize with him. ECF No. 55 at 21. Body was 29 years old at the time of the alleged incidents. *Id.* Body did not report any of the incidents to law enforcement at the time. *Id.* at 27.

**1. First March 2013 Incident**

In March 2013, Body and four other persons left Tiny's Bar in Colville, Washington after the bar closed. *Id.* at 21–22. The group, including Body, were impaired due to varying degrees of intoxication. *Id.* at 22. Newport pulled up to the group in his patrol vehicle. *Id.* After talking with the group, Newport offered Body a ride home, which she accepted. *Id.* at 22–23.

After driving for some distance, Newport turned off the road into a dead end. *Id.* at 23. Newport exited the vehicle, opened Body's door, and asked her to get out of the car. *Id.* When Body left the car, Newport began "making out" with her. *Id.* at 24. They then had sexual intercourse.[1] *Id.* Afterwards, Newport drove Body home. *Id.* at 25.

―――――――――――――

[1] The parties dispute whether Body consented to Newport's advances. *Compare* ECF No. 40 at 3 (noting that "Body did not resist his advances nor did she say anything indicating she wanted him to stop) *with* ECF No. 55 at 24 (noting that

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 2

### 2. Second March 2013 Incident

Some days later, Body drove past Newport while Newport was in his patrol car. *Id.* at 26. Newport followed Body, turned on his overheard flashing lights, and pulled her over to the side of the road. *Id.* Body had been drinking and was intoxicated. *Id.* After asking Body if she was okay to drive, Newport began kissing her. *Id.* Body and Newport again had sexual intercourse.[2] *Id.* at 27.

### 3. Third March 2013 Incident

Three or four days later, Newport followed Body from a Wal-Mart parking lot and pulled her over using his patrol vehicle's overhead lights at the same location. *Id.* Body and Newport again had sexual intercourse. ECF No. 40 at 4.

/ / /

_____

Body did not resist "[b]ecause she was highly intoxicated and Officer Newport was an officer of the law"). This factual dispute will be addressed during the Court's analysis of Plaintiffs' 42 U.S.C. § 1983 cause of action.

[2] The parties again dispute whether Body consented to Newport's advances. *Compare* ECF No. 40 at 4 ("She did not resist, she did not tell him anything indicating her unwillingness to have sex, and she did not object.") *with* ECF No. 55 at 27 ("Body did not physically resist Officer Newport or tell him to stop."). This factual dispute will be addressed during the Court's analysis of Plaintiffs' 42 U.S.C. § 1983 cause of action.

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 3

**B. Incident Involving Plaintiff Knickerbocker**

On or about the first week of March 2013, Newport walked Plaintiff Knickerbocker home after Knickerbocker had been drinking. ECF No. 55 at 28. Knickerbocker knew Newport to be a police officer. *Id.* Newport left, but then returned and entered Knickerbocker's apartment without invitation and stayed for between fifteen and twenty minutes. *Id.*

On March 9, 2013, Knickerbocker left a local bar where she had been drinking until closing. *Id.* at 29. After she returned home, Newport knocked on her door. *Id.* Newport entered, sat on Knickerbocker's couch, and left after around fifteen minutes. *Id.* at 29–30. Knickerbocker then went to a neighbor's apartment. *Id.* at 30.

Upon returning home, Knickerbocker found Newport inside her apartment. *Id.* at 31. Newport placed handcuffs and his duty belt on Knickerbocker. *Id.* These were then removed at Knickerbocker's request. *Id.* at 32. Although Knickerbocker's memory is hazy, Knickerbocker reports that they had sexual intercourse in her bedroom. *Id.* Newport then left the apartment. *Id.*

Knickerbocker reported the incident to law enforcement on March 10 or 11, 2013. *Id.* at 33.

**C. Subsequent Investigation**

Following Knickerbocker's complaint, Newport was placed on administrative leave. *Id.* On October 7, 2013, Newport was charged with a variety of criminal conduct. *Id.* Ultimately, Newport pleaded guilty to residential burglary with sexual

motivation, custodial sexual assault in the first degree, unlawful imprisonment with sexual motivation, and two counts of making false or misleading statements to a public servant. *Id.* at 34. Newport was then terminated by the City of Colville. *Id.* at 34–35.

**D. History of Supervision of Colville Police Officers**

In January 2011, Colville received two written complaints alleging that Officer Charles Walls had a sexual relationship with Brandy Sue Silvey ("Silvey"), which involved Silvey's unauthorized ride along in Walls' police vehicle while he was on duty. ECF No. 41-4 at 3-6, 27, 30. Silvey and her landlord alleged that Silvey and Walls had texted while he was on duty, and that Walls had sent Silvey sexually explicit text messages. ECF No. 41-4. Following a limited internal investigation, Walls was suspended for one week without pay for violation of the City's policy regarding authorized passengers in vehicles. ECF No. 41-4 at 25. Colville's policies with regards to officer supervision did not change after 2011. ECF No. 41-4 at 19, 24.

In April 2013, Colville received a complaint that a different police officer, Officer Scott Arms, had offered to buy a 17-year-old a drink. ECF No. 53-6 at 9. Arms later resigned in lieu of termination regarding a different matter in a different jurisdiction and an investigation into the allegation was not completed. ECF No. 53-8.

## DISCUSSION

Defendant City of Colville moves for summary judgment on Plaintiffs' § 1983 cause of action, arguing that Plaintiffs cannot satisfy the *Monell v. Department of Social Services*, 436 U.S. 658 (1978), analysis for municipal liability.  ECF No. 39 at 3.  Colville further asserts that summary judgment is appropriate in favor of Defendant Newport in his official capacity.  *Id.*

## I.    Summary Judgment Standard

Summary judgment is appropriate when the moving party establishes that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the non-moving party to set out specific facts showing that a genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  A genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' "  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted).

The evidence presented by both the moving and non-moving parties must be admissible.  Fed. R. Civ. P. 56(c)(2).  Evidence that may be relied upon at the

1  summary judgment stage includes "depositions, documents, electronically stored

2  information, affidavits or declarations, stipulations . . . admissions, [and]

3  interrogatory answers." Fed. R. Civ. P. 56(c)(1)(A). The Court will not presume

4  missing facts, and non-specific facts in affidavits are not sufficient to support or

5  undermine a claim. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

6       In evaluating a motion for summary judgment, the Court must draw all

7  reasonable inferences in favor of the non-moving party. *Dzung Chu v. Oracle Corp.*

8  *(In re Oracle Corp. Secs. Litig.)*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson*

9  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

10  **II.    42 U.S.C. § 1983**

11       To state a claim under 42 U.S.C. § 1983, "a plaintiff must allege the violation

12  of a right secured by the Constitution and laws of the United States, and must show

13  that the alleged deprivation was committed by a person acting under color of state

14  law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

15  **III.   *Monell* Liability Against City of Colville**

16       "A municipality may not be sued under § 1983 solely because an injury was

17  inflicted by its employees or agents." *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th

18  Cir. 2006) (citing *Monell*, 436 U.S. at 694). To sustain a § 1983 cause of action

19  against a municipality, the "execution of a government's policy or custom [must]

20  inflict[] the injury." *Id.* To impose liability against a municipality, a plaintiff must

21  demonstrate that 1) "a county employee violated the plaintiff's constitutional rights";

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 7

2) "the county has customs or policies that amount to deliberate indifference"; and

3) "these customs or policies were the moving force being the employee's violation of constitutional rights." *Id.* at 1186.

### A. Constitutional Violation

Colville argues that "[i]f the encounters were consensual, then no constitutional violation can be established because the personal pursuits of Newport while on duty are not acts done under color of state law." ECF No. 39 at 12. Plaintiffs contend that the various incidents should be analyzed under the Fourth and Fourteenth Amendments, depending on whether the conduct occurred in the course of a seizure. ECF No. 54 at 15.

### *1. Framework*

Where sexual misconduct occurs during an arrest or investigatory stop, "it is properly analyzed exclusively under [the Fourth Amendment] and not under the broader concept of substantive due process." *Tarabochia v. Adkins*, 766 F.3d 1115, 1129 (9th Cir. 2014); *see also Fontana v. Haskin*, 262 F.3d 871, 881 (9th Cir. 2001) ("However, Fontana's claim, although a possible fit under the Fourteenth Amendment, is better seen as a Fourth Amendment claim because she had been seized by the police."). Where no seizure has occurred, "[s]exual misconduct by a police officer toward another generally is analyzed under the Fourteenth Amendment." *Fontana*, 262 F.3d at 882.

### a. Fourth Amendment

"Beyond the specific proscription of excessive force, the Fourth Amendment generally proscribes 'unreasonable intrusions on one's bodily integrity,' and other harassing and abusive behavior that rises to the level of 'unreasonable seizure.' " *Id.* at 878–79 (quoting *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000)). "[O]nce a seizure has occurred, it continues throughout the time the arrestee is in the custody of the arresting officers." *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985).

"Assessing the Constitutionality of police action during a seizure involves a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Fontana*, 262 F.3d at 880 (internal quotation marks and citation omitted).  There "can be no 'countervailing governmental interest' to justify sexual misconduct."  *Id.* "[N]ot every truthful allegation of sexual bodily intrusion during an arrest is actionable as a violation of the Fourth Amendment . . . [as] [s]ome . . . may be provable accidental or *de minimis* and thus constitutionally reasonable."  *Id.*

In *Fontana*, the court held that the plaintiff had alleged a Fourth Amendment violation as the police officer "engaged in unreasonable, non-consensual, inappropriate touching and propositioning."  *Id.*  The defendant officer allegedly made sexual comments to and put his arm around the plaintiff while the plaintiff was handcuffed in the backseat of the police vehicle.  *Id.* at 875.  The claims of the

officer's conduct "if they occurred as described, were an abuse of power and, under the circumstances, unreasonable intrusions into Fontana's bodily integrity in violation of the Fourth Amendment." *Id.* at 881.  The court concluded that "[t]here is no situation that would justify any amount of purposeful sexual verbal and physical predation against a handcuffed arrestee." *Id.*

### b. Fourteenth Amendment

"[B]ehavior by officials that 'shocks the conscience' has been held to deprive liberty in violation of the due process clause of the Fourteenth Amendment." *Id.* "The threshold question is 'whether the behavior of the government officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* at 882 n.7 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998)).  Sexual predation by a police officer, "unjustifiable by any governmental interest," is an "arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice.' " *Id.* (quoting *Lewis*, 523 U.S. at 845, 849).  If proved, sexual predation by a police officer is "egregious and outrageous and shocks the conscience as a matter of law." *Id.*

### 2. Plaintiffs' Alleged Incidents

As discussed above, Plaintiffs have alleged four instances where Newport engaged in sexual misconduct while on duty: three incidents with Plaintiff Body and one incident with Plaintiff Knickerbocker.  The Court will address each in turn.

### a. Body's First March 2013 Incident

In March 2013, Newport gave Body a ride home while she was intoxicated. ECF No. 55 at 23. The pair then had sexual intercourse by Newport's police vehicle. *Id.* at 24.

If the initial contact between Newport and Body was voluntary and consensual, there was no "seizure" under the Fourth Amendment. *See United States v. Crasper*, 472 F.3d 1141, 1145 (9th Cir. 2007) ("The first question that we must answer is whether the initial conversation with Defendant was a seizure or, instead, was voluntary and consensual."). As Body voluntarily accepted a ride home from Newport, the Court finds that the first March 2013 incident is properly analyzed under the Fourteenth Amendment, as opposed to the Fourth Amendment.

Following *Fontana*, if the facts as alleged are proved at trial, Body may demonstrate that Newport deprived her of her Fourteenth Amendment right to bodily integrity. Newport's sexual misconduct was "unjustified by any government interest" and "shocks the conscience as a matter of law." *See Fontana*, 262 F.3d at 882 n.7.

### b. Body's Second March 2013 Incident

Body alleges that in the second incident Newport pulled her vehicle over to the side of the road by utilizing his police vehicle's official lights. ECF No. 55 at 26. "An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 11

1    (1996).  As Newport initiated a traffic stop of Body's vehicle, the Court finds that the

2    second March 2013 incident is properly analyzed under the Fourth Amendment.

3         Similar to above, if the facts as alleged are proved at trial, Body may

4    demonstrate that Newport deprived her of her Fourth Amendment right to be free

5    from unreasonable seizures.  Purposeful sexual misconduct can never be

6    "reasonable" under the Fourth Amendment.  *See Fontana*, 262 F.3d at 880.

7         ### c.  Body's Third March 2013 Incident

8         In the third incident, Newport again pulled over Body's vehicle using his

9    official police vehicle.  ECF No. 55 at 27.  As such, the Court concludes that the third

10   incident is properly analyzed under the Fourth Amendment.  For the reasons stated

11   above, if the facts as alleged are proved at trial, Body may demonstrate a Fourth

12   Amendment violation.

13        ### d.  Knickerbocker's March 2013 Incident

14        In the Knickerbocker incident, Knickerbocker returned to her residence to find

15   Newport inside.  ECF No. 55 at 32.  At some point, Newport placed handcuffs on

16   Knickerbocker, which were later removed at her request.  *Id.*  Newport and

17   Knickerbocker later had sexual intercourse.  *Id.*

18        Although handcuffs were placed on Knickerbocker, there is no indication that

19   this was for the purpose of an arrest.  As the Knickerbocker incident occurred outside

20   the setting of a custodial arrest or investigatory stop, the Court concludes that the

21   Knickerbocker incident is properly analyzed under the Fourteenth Amendment.

1    Following *Fontana*, if the facts as alleged are proved at trial, Knickerbocker

2  may demonstrate that Newport deprived her of her Fourteenth Amendment right to

3  bodily integrity.  Newport's sexual misconduct was "unjustified by any government

4  interest" and "shocks the conscience as a matter of law."  *See Fontana*, 262 F.3d at

5  882 n.7.

6      **3.  Consent**

7    Colville argues that "[i]f the encounters were consensual, then no

8  constitutional violation can be established."  ECF No. 39 at 12.  Plaintiffs contend

9  that "whether the encounters were consensual or non-consensual cannot be

10 determined by the Court on summary judgment."  ECF No. 54 at 21.

11    The Court finds that a genuine issue of material fact precludes summary

12 judgment concerning whether Plaintiffs consented to the sexual contact with

13 Newport.  Plaintiffs state that they did not actively resist Newport's advances because

14 they were concerned of his status as a law enforcement officer.  *See* ECF No. 53-4 at

15 17 (Body explaining that she did not resist "[b]ecause I was heavily intoxicated with

16 an officer of the law . . . and unsure of why I was in the position I was in to begin

17 with"); ECF No. 53-5 at 29–30 (Knickerbocker explaining that she "blacked some of

18 it out" and then "cried [her]self to sleep" after Newport left). Further, both Plaintiffs

19 were heavily intoxicated during these encounters, potentially nullifying their ability

20 to consent.

21

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 13

As such, there is a genuine issue of fact as to whether Plaintiffs truly consented to the sexual encounters with Newport. If a jury finds that Plaintiffs did consent freely and voluntarily, then Plaintiffs will not have suffered a violation of their constitutional rights. However, the Court cannot appropriately make that determination at the summary judgment stage given the conflicting interpretations of the record.

### 4. Under Color of Law

Colville argues that "[i]f the encounters were consensual, then no constitutional violation can be established because the personal pursuits of Newport while on duty are not acts done under color of state law." ECF No. 39 at 12.

"There is no 'rigid formula' for determining whether a state or local law official is acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir. 2006). A state employee generally acts under color of law when "a state employee … wrongs someone 'while acting in his official capacity or while exercising his responsibilities pursuant to state law.' " *Naffe v.* Frey, 789 F.3d 1030, 1036 (9th Cir. 2015) (quoting *West v. Atkins*, 487 U.S. 42, 50 (1988)); *see, e.g.*, *Dan Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 480 (9th Cir. 1991) (upholding jury determination that defendant acted under color of law when he sexually assaulted women looking for employment while meeting with them under pretext of providing services pursuant to his job); *McDade v. West*, 223 F.3d 1135, 1149 (9th Cir. 2000)

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 14

1  (holding employee acted under color of law when she accessed a government

2  database during work hours using a computer and password issued by her employer).

3      Whether a police officer's duties are performed under color of state law is a

4  question of fact.  *See Gritchen v. Collier*, 254 F.3d 807, 813 (9th Cir. 2001).  An

5  officer may act under color of law if the officer used his "government position to

6  exert influence and physical control" over a plaintiff, particularly if the plaintiff was

7  "in awe of government officials." *Dan Vang*, 944 F.2d at 480.  Further, an officer acts

8  under color of law "if he had purported to act under color of law, even if his goals

9  were private and outside the scope of authority."  *Van Ort v. Estate of Stanewich*, 92

10  F.3d 831, 835 (9th Cir. 1996).

11      Concerning the second and third Body incidents, the Court finds that, should

12  the jury find that Body did not consent to the sexual contact, Newport acted under

13  color of law because he initiated the interaction while he was on duty by pulling

14  Body's vehicle over to the side of the road.  *See* ECF No. 55 at 26–27.  Even if

15  Newport had non-official goals in mind, Newport "purported to act under color of

16  law" by initiating the traffic stops in his police vehicle while on duty.

17      Concerning all four incidents, the Court finds that, should the jury find that

18  neither Plaintiff consented to the sexual contact, there is a genuine issue of material

19  fact concerning whether Plaintiffs were influenced by Newport's government

20  position.  Although Colville states that "Plaintiffs readily admit that Newport made

21  no . . . threat in this case," ECF No. 39 at 12, both Plaintiffs allege that they acted, or

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 15

failed to resist, because of Newport's status as a police officer.  *See* ECF No. 53-4 at 17 (Body explaining that she did not resist "[b]ecause I was heavily intoxicated with an officer of the law . . . and unsure of why I was in the position I was in to begin with"); ECF No. 53-5 at 29–30 (Knickerbocker explaining that she "blacked some of it out" and then "cried [her]self to sleep" after Newport left).  As such, a jury could find that Plaintiffs only acted, or failed to resist, due to Newport's official position, which raises a genuine issue of material fact that precludes summary judgment on this issue.

### 5. *Conclusion*

The Court finds that Plaintiffs have demonstrated genuine issues of material fact concerning whether Newport, a municipal employee, violated their constitutional rights while acting under color of state law.

### B. Custom or Policy

Colville argues that Plaintiffs "cannot point to any policy, practice or custom that resulted in the claimed constitutional violation."  ECF No. 39 at 15.  Plaintiffs contend that Colville's failure to train against sexual misconduct and failure to supervise the graveyard shift constitutes the requisite policy or custom.  ECF No. 54 at 24.

Theories based on a municipality's failure to train or supervise officers can serve as the basis for liability under § 1983 only where the failure to train or supervise amounts to "deliberate indifference to the rights of persons with whom the

municipal employees come into contact." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) (holding that the inadequate training standard applies to allegations of inadequate supervision). A policy giving rise to local government liability cannot be established merely by identifying conduct that is properly attributable to the municipality; "[t]he plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cty. Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997).

Proof of random acts or isolated incidents of unconstitutional action by a non-policymaking employee is generally insufficient to establish the existence of a municipal policy or custom. *McDade*, 223 F.3d at 1141; *see also Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference."). However, in those limited circumstances where the need for more training or supervision is patently obvious, and the inadequacy likely to result in the violation of constitutional rights, the policymakers of the municipality can reasonably be said to have been deliberately indifferent to the need. *See Canton*, 489 U.S. at 390. Whether Colville acted with deliberate indifference by failing to supervise or train its police officers after notice of one officer's alleged sexual misconduct in conjunction with other evidence is a question of fact. *See Castro v. Cty. of L.A.*, 797 F.3d 654, 666-67 (9th Cir. 2015).

At oral argument, Plaintiffs' counsel argued that Colville's failure to supervise its police officers, combined with Colville's knowledge of the Walls investigation, presents a genuine issue of material fact of deliberate indifference, which must be submitted to the jury. In support of this position, Plaintiffs rely on several pieces of evidence including the 2011 investigation of Walls for sexual misconduct to demonstrate that Colville should have known that additional training and/or supervision was required.[3] ECF No. 54 at 27.

Second, Plaintiffs rely on the deposition testimony of Colville Chief of Police Robert Meshishneck. ECF No. 53-1. Chief Meshishneck stated in his deposition that he was the policy maker for the Colville Police Department, *id.* at 11, and he admitted that the department did not have sexual harassment policies in place. *Id.* at

---

[3] At oral argument Plaintiffs' counsel asserted that Colville should have known that additional training and supervision was required because of an April 2013 report that an officer allegedly offered to buy a minor a drink. This incident was reported almost a month after Colville was informed of the allegations against Newport and therefore has no basis on whether Colville should have known that additional training or supervision was necessary to prevent Newport's actions. *See Flores v. Cty. of L.A.*, 758 F.3d 1154, 1159 n. 11 (9th Cir. 2014) (reasoning that 2013 incidents, which occurred after a 2011 assault, could not impute to the defendants a knowledge of the risk in 2011).

28.  He stated that the police department had ten commissioned police officers, with two reserve officers.  *Id.* at 9.  Chief Meshishneck affirmed that he delegated the responsibility for supervising his police officers to Sergeant Keith Kendall.  *Id.* at 35. Further Chief Meshishneck states in his deposition that he does not remember whether anyone in his department made unofficial statements to its employees regarding the department's zero tolerance for officer-initiated sexual contact with citizens.  *Id.* at 45-48.

Plaintiffs also rely on Sergeant Kendall's deposition.  ECF No. 53-2.  In the deposition, Sergeant Kendall confirms that he took Walls at his word on the issue of whether Walls was or was not on duty when he sent sexually explicit texts to Silvey. *Id.* at 79-80.  Further, Sergeant Kendall admits that he did not investigate whether or not Walls had threatened retaliation against Silvey, despite the fact it was included in her landlord's written statement.  *Id.* at 68.  Sergeant Kendall characterized his supervision methodology as follows:

> I didn't feel I needed to check up on my troops every single minute of the days [sic], because I trusted them, and I believed that they had strong, ethical values where they would be out there doing their job, what they're paid to do, what their job description was.  And I had no evidence, no inclination of them not out there doing their job.

*Id.* at 81.  In addition, Plaintiffs rely on Newport's deposition statements:

> Q. What did you tell Mr. Finer in any conversations you had with him at that time about the case?
> A. That -- I made the comment that if we had supervision at nighttime at my -- that I had requested before, I probably would not have been doing what I was doing, having sex on duty.

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 19

1  Q. What you said was that if somebody had been supervising you more
2  closely, you would have kept your dick in your pants, correct?
   A. Yes.

3  ECF No. 53-3 at 86.

4  Newport further suggests that one factor contributing to his sexual

5  misconduct was Colville's lack of supervision of the night shift. *See id.* at 87-88.

6  ("Q. Okay.  Did you say anything to Mr. Pulver to indicate that the reason that you

7  committed these crimes that you pleaded guilty to was because of the scheduling at

8  the Colville Police Department? …. A. Well, I know it didn't happen on day shift,

9  so – it was night shift.  Q. What do you mean by that answer?  A.  I wasn't

10 cheating on my wife on day shift."); *id.* at 89 ("Q. Yeah.  Other than the poor

11 scheduling, that is, as you explained, the day shift versus the night shift, did you

12 tell Mr. Pulver that there were any other poor scheduling issues that caused you to

13 commit these crimes?  A.  I made a comment that I – I requested Sergeant Kendall

14 being a night – coming out at nighttime at least occasionally because – maybe that

15 was me.  I don't know.  But there was other guys that weren't handling calls, and I

16 would have liked some supervision at nighttime.").

17 In addition, Plaintiffs rely on the report of liability expert Winthrop Taylor.

18 ECF Nos. 20, 53-6.  Taylor was hired to investigate the adequacy of Colville's

19 training and supervision of Newport, and his report states:

20  I found no explicit policy statement addressing sexual misconduct in
    any of the Colville Police Department documents provided for my
    review.  I noted that the index for the Police Policy Manual (Bates 6624
21  & 5) listed Chapter 7.00.00 "Conduct" and 8.00.00 "Discipline"

however neither chapter was found to exist in the body of the manual. Chapter 6 ends at Bates Page 6680 and Chapter 9 starts at Bates 6681. Additionally, nothing was found in the manual defining misconduct or articulating the procedures for department personnel to follow when a citizen makes a complaint against an officer.  It was noted that the manual appears to have had four chapters revised in 2011; none addressed misconduct.  Only one chapter has been revised since February 2011; Chapter 20 (Preventing Biased Policing) was added in February 2014.

Conclusion: The Colville Police Policy Manual is inadequate to provide the most basic direction to police officers and supervisors in the specific areas of misconduct and the procedure for dealing with citizen complaints of misconduct.  This manual falls short of industry standards when compared to the model policies offered by the International Association of Chiefs of Police (IACP) and/or the Washington Association of Sheriff's [sic] and Police Chiefs (WASPC). Both of which offer assistance to smaller agencies upon request.

*Id.* at 4.

Of particular relevance to Taylor's report was Sergeant Kendall's admission that Walls' on-duty texting of sexually explicit messages to Silvey was not a violation of the City's policies.  *Id.* Taylor's supplemental report concluded:

Conclusion: There was no direct supervision of patrol officers during the night time at Colville police department. This was done with the knowledge and approval of the police chief.  As the final policy maker in the police department, Chief Meshishneck permitted a custom of no oversight to exist on the night watch.

Conclusion: Chief Meshishneck as the final policymaker of the police department took no proactive steps to prevent or discourage further sexual misconduct upon being confronted with Officer Walls [sic] transgressions in 2011.  As a direct result two more acts of sexual misconduct ensued.

*Id.* at 6.

ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT~ 21

Plaintiffs have submitted evidence that Colville failed to fully investigate the complaint against Walls for sexual misconduct.  Plaintiffs have submitted evidence that Colville failed to remedy the department's lack of written sexual harassment or sexual misconduct policies after the Walls investigation, and further that the Chief of Police could not remember whether he or his subordinate explained to the remaining officers at their small police department that the department did not tolerate officer sexual misconduct after the Walls investigation.  Plaintiffs have submitted evidence that Sergeant Kendall simply trusted his officers, rather than supervising those on night duty.  Plaintiffs also have submitted testimony by Newport that he was not supervised and that if he had been supervised that his misconduct would not have occurred.

In light of the submitted evidence, Plaintiffs have raised a genuine issue of material fact as to whether Colville's failure to fully investigate the complaint against Walls, failure to remedy the department's lack of sexual harassment and sexual misconduct policies, and failure to adequately inform and train officers regarding sexual harassment and sexual misconduct, amounts to a policy or custom attributable to the city.

Moreover, viewing Newport's deposition testimony in the light most favorable to Plaintiffs, Plaintiffs have submitted evidence that if Newport had been supervised on night duty, he would not have perpetrated the sexual misconduct. *Dzung Chu*, 627 F.3d at 387 (at summary judgment, the district court must draw all

reasonable inferences in favor of the non-moving party).  Viewed in the light most favorable to Plaintiffs, Newport's testimony establishes a direct causal link between Colville's failure to supervise or train and Plaintiffs' alleged deprivations of federal rights.

The Court finds that Plaintiffs have raised a genuine issue of material fact as to whether Colville's policies and failures amounted to "deliberate indifference to the rights of persons with whom the municipal employees come into contact." *Canton*, 489 U.S. at 389.  Therefore, the Court denies Colville's motion for summary judgment.

## IV.    *Monell* **Liability Against Newport in his Official Capacity**

Colville moves for "dismissal of the claim . . . against Newport to the extent it alleges an official capacities claim."  ECF No. 39 at 10 n.2.  Colville asserts that "[l]iability for city officials in their official capacities is another form of action against the city, and it requires the same showing that a policy or custom caused the alleged violation."  *Id.*

While Newport is a distinct defendant from Colville, Plaintiffs allege claims against Newport in his official capacity.  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159 (1985).  As such, the Court applies the same principles in analyzing Newport's liability in his official capacity as the Court has applied in the

*Monell* liability claim against Colville and denies summary judgment on Newport's liability in his official capacity.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Defendant City of Colville's Motion for Summary Judgment of Defendant City of Colville and Defendant Rex Newport in his Official Capacity, **ECF No. 39**, is **DENIED.**

The District Court Clerk is directed to enter this Order and provide copies to counsel.

**DATED** this 11th day of August 2016.


_____*s/ Rosanna Malouf Peterson*_____
ROSANNA MALOUF PETERSON
United States District Judge